## Robinson *versus* Hodgson.

1. The owner of negotiable securities which have been stolen may follow them and reclaim them in whose hands soever they may be found, and when shown that the securities had been stolen from the owner, the burden is upon the holder to show that he took them in the usual course of business and for value.

2. In trover for such securities, merely showing that they were in possession of another from whom defendant or his immediate bailor received them is not a defence.

3. A holder's possession in primâ facie evidence of ownership, because the presumption is that it was honestly acquired.

February 25th 1873.    Before READ, C. J., AGNEW, SHARSWOOD, WILLIAMS and MERCUR, JJ.

Error to the District Court of *Philadelphia* : No. 112, to January Term 1872.

On the 22d of September 1870, Henry D. Hodgson, executor, &c., of Mark A. Hodgson, deceased, brought an action of trover against Robert E. Robinson for certain bonds of the Philadelphia and Baltimore Central Railroad Company, which had been stolen from the decedent.

The case was tried June 13th 1871, before Thayer, J.

The plaintiff gave evidence, by James M. Ramsey, the treasurer of the company, that decedent had been the owner of six bonds of $100 each, and one bond of $200, issued by the Philadelphia and Baltimore Central Railroad Company ; the bonds were coupon bonds, were payable to bearer, and were worth about par or slightly more.

He also gave evidence that these bonds, with a number more of the same kind belonging to other persons, were stolen September 24th 1864. All the bonds had been in a safe of Robert & George D. Hodgson in their warehouse in the borough of Oxford, Chester county ; the door of the safe had been drilled and blown off, and the bonds taken. The whole amount of bonds taken was $4100. An advertisement by police officers of Philadelphia, and also one by Robert Hodgson were published, announcing the robbery and describing the bonds (except three) of all the owners ; with a request to brokers and others to examine the lists, and give information at the mayor's office.

James A. Strawbridge (who was administrator, &c., of G. A. Hodgson, deceased, one of those whose bonds had been stolen) testified that in February 1870, he met the defendant at the office of the treasurer of the railroad company ; the defendant said that he had come there to inquire about the stolen bonds ; " I told him I represented most of the bonds, and asked him where they were ; he said in New York ; I asked him to give me all the information he had ; he said he had seen them, and had had them in his hands ; he said they were sent by his (defendant's) brother, in New York,

[Robinson *v.* Hodgson.]

through Drexel, Winthrop & Co., in New York, to Drexel's in Philadelphia; that his brother had received them from a diamond broker in New York;" at witness's request defendant, witness and Mr. Hodgson went to Drexel's office; the clerk there gave him the package, which was opened, and compared with a list of the stolen bonds which witness had; after the examination the defendant said, " I am satisfied these are the Hodgson stolen bonds." It was then agreed to leave them in charge of Mr. Drexel, but he refused to receive them; the defendant then took the bonds; they stopped before De Haven's; defendant went in there, and proposed to meet the others at the depot before the train started; witness then got a search-warrant from the recorder, and went with it to the depot "to attach the bonds on defendant's person." Defendant was at depot according to appointment, and on being asked said he had left the bonds at De Haven's; he and the officer went there, and he came to the recorder's office with the bonds, which were deposited with the recorder to remain till a hearing in the next week. Six days after witness, with his counsel, met defendant and Mr. Harrington, defendant's counsel, at the recorder's office, when the bonds were given to the defendant under a mutual agreement that he would hold them until a trial should be had in Philadelphia to determine their ownership; the defendant said he would be responsible for their forthcoming; he agreed to accept service, and try the right to the bonds.

On cross-examination witness testified that the defendant said he believed the bonds had been stolen, and that he would do all he could to get their owner; the defendant lived in Wilmington, Delaware.

James Given, Esq., the recorder, testified, that all the bonds alleged to have been stolen, including the three not mentioned in the advertisement, were before him and in his custody under a search-warrant; that they had gone out of his possession in pursuance of an agreement of the counsel of the parties, in their presence, that the right should be tried in court. De Haven, who was defendant's brother-in-law, was to hold the bonds for him; that before witness, the defendant said that he knew the bonds had been stolen from Hodgson.

Joseph Huddell, the secretary of the railroad company, testified, that in February 1870, the defendant came to him at the company's office and asked if there were not some stolen bonds of the company; to a question by witness, he said he knew it by information from Mr. Quigley, of Wilmington; defendant said he knew of bonds being offered for sale, and had a list of them; witness compared a list he had of the stolen bonds, with the list of defendant.

H. D. Hodgson, plaintiff, testified as Mr. Strawbridge as to most of the facts stated by him; and also that defendant said the bonds had

[Robinson *v.* Hodgson.]

been sent to him by his brother, who was in Drexel's house, New York; defendant at the recorder's office agreed to accept service in a suit to be tried in Philadelphia to determine the ownership of the bonds.

A. De Haven testified, that he was a member of the firm of De Haven & Brother, brokers in Philadelphia, and recollected the bonds; the firm had sent the bonds to New York, by direction of the defendant or Mr. Harrington his counsel; the bonds had been received by their firm March 1st 1870, subject to defendant's order; and on March 6th 1870 they sent them to New York, to J. N. Robinson, care of Drexel, Winthrop & Co.

J. N. Robinson is a member of that firm and brother of defendant.

Plaintiff gave in evidence a letter from Mr. Harrington to Mr. McVeagh, one of plaintiff's counsel, written shortly before April 9th 1870, in which Mr. Harrington said that it had been his purpose when he received the bonds to hold them till the title to them should be settled in the suits to be brought without reference to time; that they were deposited with De Haven & Brother, subject to his order alone; and he had been surprised to learn three weeks afterwards that the defendant without his authority obtained possession of the bonds and returned them to Drexel, Winthrop & Co. After learning this he had insisted to defendant that he should inform plaintiff's counsel and tell them the exact state of the case, disclose the name of the party pretending to be the owner, who was then under arrest in New York, for receiving other stolen bonds and goods. Mr. Harrington enclosed in the letter slips from New York papers showing "the name, place of business and offences of the party who claimed to own the bonds."

The banking-house of Drexel & Co., Philadelphia, and Drexel, Winthrop & Co., New York, are one establishment, composed of the same partners.

The plaintiff rested.

The defendant testified that he had been in the banking business in Wilmington for about twenty years, that his brother, J. N. Robinson, lived in New York, and that the business he had with the New York house was transacted through his brother; he had received from his brother a letter dated,

"Banking House of Drexel, Winthrop & Co.
New York, February 9th 1870."

The writer said that a party had called on that day to sell 3100 Baltimore Central first mortgage bonds; he did not know much about the person offering them; he gave his name as William C. Brandon, 702 Broadway; the letter proceeded: "I am thus particular about giving you where they came from, as we don't want to take any responsibility in selling them, though I am

[Robinson v. Hodgson.]

told if you pay the value of bonds, and have no reason to suspect anything wrong, that the holder of coupon bonds, even if stolen, can keep them. I want you to inquire of the Philadelphia, Wilmington and Baltimore folks, and also of Bowen & Fox, who are the trustees, if any bonds have been stolen; if you find everything correct make us a bid for them, * * * his limit is 70 * * * If you can't pay 70 I think the fellow will take a little less. I enclose you the number of the bonds; part are for $100; part for $200 each."

Defendant further testified: " I went to Mr. Huddell (secretary of the company), and asked him if there had been any bonds stolen; he declined to answer; I told him if he did not tell me I would hold him responsible if I bought any stolen bonds; he said there were persons in the country who had lost some bonds, and wanted me to call again, and he would write to them. I called again, and he sent me to the office of the Philadelphia, Wilmington and Baltimore Railroad to see Mr. Ramsey, who was not there. I started out, and was called back by Hodgson and Strawbridge; they asked me what I would take to get the bonds; I said nothing; but would do all I could to get the bonds for the rightful owner; I told them the bonds were at Drexel's office."

He further testified as plaintiff's witnesses, as to the delivery of the bonds at Drexel's, and his arrest at the depot, and to giving him the bonds at the recorder's office; and that he afterwards, in company with Mr. Harrington, left them with Mr. De Haven; he afterwards got an order for the bonds, which was sent by his brother from New York; the order was as follows:—

" New York, March 3d 1870.

Messrs. Drexel, Winthrop & Co.,

Gentlemen :—

I hereby demand from you and each of you the return to me of the bonds given to you by me in the month of February 1870, to sell, amounting in all to the sum of three thousand one hundred dollars, and I demand that they be returned to me within a reasonable time.

WM. C. BRANDON,
702 Broadway."

In consequence of this order defendant sent the bonds to New York about the 4th or 5th of March. He had nothing to do with Brandon; did not receive the bonds from him or send them back to him.

A. H. De Haven testified that the bonds in the package and those on the slip of paper agreed. The agreement at the recorder's was that the bonds were to be surrendered to defendant, and to be put into the hands of De Haven & Brother, so as to remain in the

[Robinson *v.* Hodgson.]

jurisdiction of Pennsylvania, that they might be attached and test the question of ownership; they were taken away March 6.

Mr. Harrington, defendant's counsel, testified that on his own account, defendant not agreeing to it, he said that plaintiff should have the opportunity to get a legal hold on the bonds, so that if the owner in New York demanded them, defendant would have a legal excuse; witness told plaintiff's counsel that they must get a legal hold on them at once or they would be ordered back; the understanding was that they should get a legal hold on them at once; it was no part of the understanding that the bonds were to be held in the jurisdiction of Pennsylvania until the title was determined; the bonds were sent back in violation of the order of witness as attorney for defendant to De Haven; the violation of the order was by the defendant.

Robert Winthrop, in his deposition taken under a commission, said that he was a member of the firm of Drexel, Winthrop & Co.; that the bonds in question were delivered to his firm February 9th 1870, by William C. Brandon, to be sold on his account; they were forwarded by Drexel, Winthrop & Co. to R. R. Robinson & Co., Wilmington, to be sold in accordance with Brandon's instructions; the bonds were returned to witness's firm, and delivered by them to Brandon March 10th 1870; the bonds were received by the firm that they might be sold in Wilmington on Brandon's account.

Defendant gave in evidence the receipt of Brandon to Drexel, Winthrop & Co., dated March 10th 1870, for bonds of the Philadelphia and Baltimore Central Railroad Company, amounting in all to $3100, amongst which were five, the bonds claimed by plaintiff.

A number of exceptions were taken to the rulings of the court on questions of evidence not necessary to notice here.

The defendant submitted these points, all which the court declined to affirm:—

1. To maintain this action it must appear that the defendant did a positively wrongful act. If the jury find that in all that he did from the time when the bonds came to his possession down to the time when he returned them to the party from whom he had received them, he acted in good faith and with an honest purpose to preserve them in his custody so that the rightful owner might with due diligence recover them, the defendant is not liable in this action.

2. If, at the time the bonds were delivered up to the defendant or his counsel at the recorder's office, the plaintiff's counsel was notified to proceed immediately while they were in the jurisdiction and that they would have to be returned, if an order to that effect was received from the party in New York who sent them, the delay of proceedings on the part of the plaintiff was a suffi-

[Robinson *v.* Hodgson.]

cient justification for defendant in returning the bonds when the order was received. The defendant, in the absence of any legal proceedings being taken to hold the bonds or prevent him from disposing of them, was bound to comply strictly with the order of his principal to return them, and no action would lie against him for complying with the orders of his principal, received under such circumstances.

3. The return by the defendant of the bonds to the person from whom he had received them, in compliance with the order of that person, was not in itself a wrongful conversion of the bonds on the part of the defendant.

4. If the plaintiff delayed commencing his proceedings or making any formal demand for the delivery of the bonds until after they had been returned by defendant under the order of his principal, it was such laches on the part of the plaintiff as would bar his right of recovery in this action.

5. In order to make defendant responsible for the wrongful conversion of personal property on the ground of a demand and refusal, it must appear that the goods were in the possession of the defendant at the time the demand was made, or that at the time of the demand he had it in his power to give up the goods; hence, if the jury find that at the time the plaintiff demanded the bonds from the defendant, they were not in defendant's possession or control, but had previously been sent back to his principal in New York, the plaintiff cannot recover in this form of action.

6. If the jury find that Drexel, Winthrop & Co. were the agents employed by Brandon to sell the bonds, that they sent them to defendant for sale, and defendant returned the bonds to them between the 6th and 10th days of March, A. D. 1870, in compliance with their peremptory order, the verdict should be for the defendant.

7. If the plaintiff, at the time of giving up the bonds at the recorder's office, agreed with the defendant that the title should be tested by a legal process under which the bonds were to be seized immediately, and the plaintiff did not take any steps to seize and hold them by process of law until after they had been returned to Drexel, Winthrop & Co., of New York, the plaintiff cannot recover in this action.

The court charged:—

" [If the bonds were really the property of the plaintiff, and if the defendant had reason to suppose that the bonds had been stolen, and that they were the property of the plaintiff, and if he was notified of these facts, and after that did, notwithstanding such notice, and notwithstanding the claim made upon him for the bonds by the plaintiff, send them back to New York without the consent and against the will of the plaintiff, that was a wrongful conversion of the bonds for which the defendant is responsible.]

" [The law is, that a bailee who comes into possession of property that has been stolen or which bailor has no title to at all, is not excused for delivering it up to bailor after notice of that fact from the real owner, and if he does do so, it is at his own peril.   If he finds himself in such a position as that, he must at any rate stand still until the right is determined.   When he has notice that bailor has no title to the property, he has no right to deliver it to him; he must keep it.]   And one reason of that is, that it was the duty of the man who delivered the property to have acquainted the broker with the truth.   If he has not done that, then he has no right to complain if bailee withholds the property from him, for the real owner.   If he has withheld the truth from the bailee, he has no right to demand that the bailee shall restore the property to him.   The bailee who receives property for which bailor has no title, cannot, after notice of the real owner's title, return it to bailor without being responsible for it.

" Therefore, if these bonds were really the property of plaintiff, and defendant had reason to suppose they were stolen, and after notice of that fact from the plaintiff, returned them to New York, without consent of plaintiff, he is liable.

"Now with regard to the ownership of the bonds.   You are to consider the evidence, and to determine whether the plaintiff has made out his ownership.   If you are satisfied that he has, then it was incumbent upon the defendant, if he alleges ownership in another, to show it.

" [The least a man can do, if he comes into possession of stolen property, is to show how his bailor obtained the possession. Therefore, if the defendant rests his defence upon an alleged ownership of Brandon, then it was his duty to show how he acquired that ownership, how Brandon got it, and where he got it. Mere possession after robbery is no evidence of title.   And if a man gets such bonds as these, which · pass by delivery alone, after they have been stolen, he must show from whom he got them, whether in good faith and for what consideration.   It was for defendant to show all that, if he relies on the title of Brandon.] [Mr. Ramsey, the treasurer, says the bonds were issued to Mark Hodgson, and identifies them by the numbers, and it has been shown that they were subsequently stolen.   No evidence whatever has been given as to how Brandon got possession of these bonds.]"

The verdict was for the plaintiff for $824.

The defendant removed the record to the Supreme Court.

He assigned seventeen errors, of · which

4–7. Were the parts of the charge in brackets.

8–14. Declining to affirm his points.

*A. M. Burton* and *G. W. Biddle,* for plaintiff in error.—The property in bonds payable to bearer passes by delivery : Beaver Co.

[Robinson v. Hodgson.]

*v.* Armstrong, 8 Wright 65. A purchaser in good faith is not affected by his vendor's want of title, the burden of proof is on him who asserts his title: Murray *v.* Lardner, 2 Wallace 110; Goodman *v.* Simonds, 20 How. 343.

The plaintiff must prove a positive tortious or wrongful act on the part of the defendant: Bromley *v.* Coxwell, 2 Bos. & Pul. 438. Where the defendant refuses to deliver up the goods claimed, until some ownership is shown on the part of the claimant, it is no evidence of a conversion: Solomons *v.* Dawes, 1 Esp. 83; Green *v.* Dixen, 3 Campb. 215, n.; Jacoby *v.* Laussat, 6 S. & R. 305; 1 Bacon's Abr. "*Bailment,*" 618; Edwards on Bailments 83, 84. Defendant is not liable for the acts of his agent in delivering the bonds: Shotwell *v.* Few, 7 Johns. R 302; Alexander *v.* Southey 5 Barn. & Ald. 247. By the return of the bonds to the defendant, plaintiff recognised the title of Brandon to the property. He never produced any evidence to defendant that Brandon had no title; nor allege that Brandon had obtained the property wrongfully: Shelford *v.* Scotsford, Yelv. 23. Upon the doctrine of "*Respondeat superior,*" the defendant incurred no liability: Mires *v.* Solebay, 2 Mod. 242; Berry *v.* Vantries, 12 S. & R. 92. An agent cannot dispute his principal's title: Dixon *v.* Hamond, 2 Barn. & Ald. 310; Shotwell *v.* Few, 7 Johns. 302; Woodward *v.* Webb, 15 P. F. Smith 254; Carey *v.* Bright, 8 Id. 83.

*J. Goforth* and *W. MacVeagh,* for defendant in error.—If a bailor has no title, the real owner is entitled to recover the property in whose hands soever it may be found: Story on Bailments, §§ 52, 102; 2 Kent's Com. 767; King *v.* Richards, 6 Whart. 418.

Where negotiable paper has been stolen or lost, or obtained by duress, or procured or put in circulation by fraud, on proof of these circumstances it is incumbent on the holder to show himself to be a holder bonâ fide and for a valuable consideration; otherwise, he is considered as standing in no better situation than the former holder in whose hands the instrument received the taint: Beltzhoover *v.* Blackstock, 3 Watts 26; Knight *v.* Pugh, 4 W. & S. 448; Brown *v.* Street, 6 Id. 221; Gray *v.* Bank of Kentucky, 5 Casey 365.

The onus of proof of Brandon's title rests on the plaintiff in error: County of Beaver *v.* Armstrong, 8 Wright 63; Mercer County *v.* Hacket, 1 Wallace 83; Murray *v.* Lardner, 2 Id. 110; Grant *v.* Vaughan, 3 Burrows 1516; Lawson *v.* Weston, 4 Espinasse 56; Duncan *v.* Scott, 1 Campbell 100; Rees *v.* Marquis of Headford, 2 Id. 574; Douglass 611; Norris' Peake 342; Byles on Bills 394; Beltzhoover *v.* Blackstock, 3 Watts 26; Knight *v.* Pugh, 4 W. & S. 445; Brown *v.* Street, 6 Id. 221; Albrecht *v.* Strimpler, 7 Barr 477; Hutchinson *v.* Boggs, 4 Casey 294; Kuhns *v.* Gettysburg Nat. Bank, 18 P. F. Smith 448.

23 P. F. SMITH—14

[Robinson *v.* Hodgson.]

Where a person is in the possession of stolen property, and has been notified by the rightful owner that such property is his, he becomes a bailee for such owner, and his refusal to deliver the property to such owner, is evidence of conversion, no matter upon what trust, or in what capacity he received the stolen property: Shelbury *v.* Scotsford, Yelv. 23; Yorke *v.* Grenaugh, 2 Ld. Ray. ₊866; Ogle *v.* Atkinson, 5 Taunton 759; Hardman *v.* Willcock, note to 9 Bing. 382; Wilson *v.* Anderton, 1 Barn. & Ad. 450.

The opinion of the court was delivered, May 17th 1873, by

WILLIAMS, J.—The main question in this case is, whether the plaintiff below gave such evidence of ownership as entitled him to recover the bonds alleged to have been wrongfully converted by the defendant? The evidence showing that the bonds were the property of the plaintiff's testator, and that they were stolen from him, was undisputed. The defendant did not claim to be the owner of them, but set up title in Wm. C. Brandon, who left them with Drexel, Winthrop & Co., of New York, the defendant's bailors, for sale. The court charged the jury in substance, that if the bonds were really the property of the plaintiff's testator, and were stolen from him, then it was incumbent on the defendant, if he alleged ownership in another, to show how he obtained the possession; and if he rested his defence upon Brandon's alleged ownership, it was his duty to show how he acquired that ownership; that mere possession after the robbery was no evidence of title. It is contended by the plaintiff in error that this instruction was erroneous, because the presumption is that Brandon obtained the bonds honestly, and, being negotiable, his possession of them was evidence of ownership. But the owner of negotiable securities, which have been stolen, has the right to follow them wherever he can find them, and to reclaim them in whose hands soever they may be found; and it is no defence to an action for their wrongful conversion, in refusing to deliver them up on the owner's demand, for the bailee merely to show that they were in the possession of another, from whom he or his immediate bailor received them. If the defendant's possession would not be a defence, how can his bailor's be? Why should the bailor's possession be higher evidence of title than his own? Undoubtedly the holder's possession is primâ facie evidence of ownership, because the presumption is that it was honestly acquired. But when it is shown that the securities were stolen from the owner, the burden of proof is on the holder, and he must show affirmatively that he took them in the usual course of business for value. The rightful owner may assert his title to stolen property whenever he can find it, and if he could recover it from the bailor he can recover it from the bailee. The bailee can never be in a better situation than the bailor. If the bailor has no title he can give none, for he can give no better title than he has. The owner of stolen securities has the same

[Robinson v. Hodgson.]

right to recover them from the holder, unless he has taken them in the usual course of business for value, that he has to recover a chattel or other movable property that may have been stolen. There is this difference, however, the owner's right to the chattel is not divested if it has been bought by the holder in good faith without notice of the theft; but his right to negotiable securities that have been stolen is divested if they have been received by the holder in the usual course of business for value. But the burden of proof, of showing that they were thus taken, is on the holder. These are familiar and well settled principles, and require the citation of no authorities for their support. There was, therefore, no error in instructing the jury that if the defendant relied on Brandon's ownership of the bonds it was incumbent on him to show how he obtained it.

The other assignments of error need not be specially noticed. There is nothing in them that calls for a reversal of judgment, and no practical benefit would result from their discussion. There was no error in entering judgment on the verdict, and the discharge of the rule to amend the record of the verdict and judgment, with respect to the amount of damages, was a matter wholly within the discretion of the court below, and is not assignable for error here.

Judgment affirmed.